**Deposition of Tim Bell, taken November 13, 2018**

```
 1          IN THE UNITED STATES DISTRICT COURT FOR THE
                 NORTHERN DISTRICT OF MISSISSIPPI
 2                      ABERDEEN DIVISION

 3

 4   JENNIFER L. BAKER                    PLAINTIFF

 5   VS.                    NO. 1:18-CV-00018-SA-DAS

 6   CITY OF TUPELO, MISSISSIPPI          DEFENDANT

 7

 8

 9   *****************************************************

10                 DEPOSITION OF TIM BELL

11   *****************************************************

12

13

14        TAKEN AT THE INSTANCE OF THE PLAINTIFF
          IN THE LAW OFFICES OF CLAYTON O'DONNELL, PLLC
15        115 NORTH BROADWAY STREET, TUPELO, MISSISSIPPI
          ON NOVEMBER 13, 2018, BEGINNING AT 11:23 A.M.
16

17

18
                    APPEARANCES NOTED HEREIN
19

20

21
     Reported by:  REGINA D. RUSSELL, RPR, CCR 1110
22   _____

23               ADVANCED COURT REPORTING
                      P.O. BOX 761
24               TUPELO, MS 38802-0761
                    (662) 690-1500
25
```

Exhibit "12"

Deposition of Tim Bell, taken November 13, 2018

1

### Page 1

```
 1      IN THE UNITED STATES DISTRICT COURT FOR THE
               NORTHERN DISTRICT OF MISSISSIPPI
 2                   ABERDEEN DIVISION
 3
 4    JENNIFER L. BAKER          PLAINTIFF
 5    VS.         NO. 1:18-CV-00018-SA-DAS
 6    CITY OF TUPELO, MISSISSIPPI      DEFENDANT
 7
 8
 9    *******************************************************
10           DEPOSITION OF TIM BELL
11    *******************************************************
12
13
14       TAKEN AT THE INSTANCE OF THE PLAINTIFF
          IN THE LAW OFFICES OF CLAYTON O'DONNELL, PLLC
15       115 NORTH BROADWAY STREET, TUPELO, MISSISSIPPI
          ON NOVEMBER 13, 2018, BEGINNING AT 11:23 A.M.
16
17
18
             APPEARANCES NOTED HEREIN
19
20
21
      Reported by: REGINA D. RUSSELL, RPR, CCR 1110
22    _____
23           ADVANCED COURT REPORTING
                 P.O. BOX 761
24           TUPELO, MS 38802-0761
                 (662) 690-1500
25
```

### Page 2

```
 1
      APPEARANCES:
 2
      For the Plaintiff:    RON L. WOODRUFF, ESQUIRE
 3                 Waide & Associate, P.A.
                   Post Office Box 1357
 4                 Tupelo, MS  38802
                   (662) 842-7324
 5
 6    For the Defendant:    DAVID D. O'DONNELL, ESQUIRE
                   Clayton O'Donnell, PLLC
 7                 Post Office Drawer 676
                   Oxford, MS  38655-0676
 8                 (662) 620-7938
 9
10    Also Present:    JENNIFER L. BAKER
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

### Page 3

```
 1              TABLE OF CONTENTS
 2
 3    WITNESS                    PAGE
 4    TIM BELL
 5      Examination by Mr. Woodruff............   5
 6
 7
 8
 9
10    (NO EXHIBITS)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

WITNESS — PAGE
TIM BELL
Examination by Mr. Woodruff............ 5

### Page 4

```
 1              STIPULATIONS
 2    1.  It is hereby stipulated by and between counsel
          that the deposition of TIM BELL may be
 3        taken on behalf of the Plaintiff at the time
          and place set forth herein and be reported by
 4        Regina D. Russell, RPR, CCR 1110.
 5
      2.  That all objections as to the notice of the time
 6        and place of the taking of this deposition are
          hereby waived.
 7
 8    3.  That all objections except as to the form of the
          questions are reserved until the time of the
 9        trial.
10
      4.  That the reading of the testimony to or by the
11        witness and signing thereof by the witness
          are hereby expressly waived.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Deposition of Tim Bell, taken November 13, 2018**

2

---

Page 5

1        TIM BELL, after being duly sworn,
2   testified as follows:
3                EXAMINATION
4   **BY MR. WOODRUFF:**
5   **Q.** Please state your full name for the record.
6   **A.** Tim Bell.
7   **Q.** And you are a captain now?
8   **A.** I am.
9   **Q.** And what is your home address?
10  **A.** My home address?
11  **Q.** Yes, sir.
12  **A.** It's ███████████████████ in Blue
13  Springs.
14  **Q.** And your phone number?
15  **A.** ███████
16  **Q.** And you are currently employed by the
17  Tupelo Police Department?
18  **A.** Correct.
19  **Q.** What is your position?
20  **A.** Patrol Commander.
21  **Q.** And you are a captain?
22  **A.** That's correct.
23  **Q.** How long have you been a captain?
24  **A.** Close to two years now.
25  **Q.** And that was -- you were promoted from

---

Page 6

1   lieutenant?
2   **A.** Correct.
3   **Q.** And what was -- how long have you been in
4   your current position? Patrol -- I think you said
5   patrol --
6   **A.** Commander. Probably about two and a half
7   years.
8   **Q.** Who do you report to in that position?
9   **A.** Major Jackie Clayton.
10  **Q.** How many different patrol commanders -- is
11  that the correct term?
12  **A.** Yes.
13  **Q.** How many different shifts do you have?
14  **A.** Four.
15  **Q.** I've heard A, B, C and E?
16  **A.** Correct.
17  **Q.** Do you have someone over each shift?
18  **A.** Shift lieutenant.
19  **Q.** Are all of them lieutenants?
20  **A.** Yes.
21  **Q.** Who are the current four lieutenants?
22  **A.** Currently we have three. One is Doug
23  Mansell, the other one is Marty Mask and the other
24  one is John Moses. We have one vacant right now,
25  that job position is open.

---

Page 7

1   **Q.** Do you know Jennifer Baker sitting to my
2   left?
3   **A.** I do.
4   **Q.** How do you know her?
5   **A.** Past employee of the Tupelo Police
6   Department.
7   **Q.** Was she ever in your chain of command?
8   **A.** I believe briefly at one time, yes. She
9   fell under a shift commander which, of course, they
10  all fall under me.
11  **Q.** Right. When you were shift commander,
12  obviously, she was in your chain of command.
13  **A.** Yeah. I don't think she ever worked for me
14  when I was a shift commander.
15  **Q.** She never worked on your shift?
16  **A.** Not that I remember, no.
17  **Q.** Did you ever actually work with her at
18  times when she was working?
19  **A.** On a one-on-one basis, not that I recall.
20  Like I said, when I was moved to the shift commander
21  position, she was still employed there, so I may have
22  worked some of the same days that she worked.
23  **Q.** Do you know how her performance as a police
24  officer was?
25  **A.** I didn't have any issues with her. I think

---

Page 8

1   there was one issue where she had her hair down below
2   her collar, I just told her shift commander that it
3   needed to be raised, which was above the collar. And
4   other than that, that was the only issue I ever
5   remember.
6   **Q.** Was that Chamila Brown you told?
7   **A.** It may have been.
8   **Q.** Are there any other females who have their
9   hair below their collar?
10  **A.** Not that worked for me on patrol division.
11  **Q.** Have you ever told an employee that they
12  needed to get their hair above, a female employee
13  that they needed to get their hair above the collar
14  before?
15  **A.** I'm sure I have. I know Baker was one of
16  them that I told the shift supervisor.
17  **Q.** And as far as you recall, that's the only
18  issue you had with her prior to 2017 and the events
19  leading up to her termination?
20  **A.** Yes.
21  **Q.** Okay. Were you present when she had a
22  meeting around January 3rd, 2017, concerning the
23  issue of overtime?
24  **A.** Who would that have been with?
25  **Q.** I thought I saw your name. Give me just a

---

**Deposition of Tim Bell, taken November 13, 2018**

3

---

Page 9

1 second. My understanding was January 3rd, 2017, with
2 you and Mr. Gilbert concerning an issue with her
3 overtime.
4     **A.** I remember there was a meeting with Baker
5 and the deputy chief and myself. I do not remember
6 the date or the time or if it was exactly concerning
7 overtime itself. I remember it was about some type
8 of compensation for her.
9     **Q.** Okay. And I think we're talking about the
10 same meeting. And what do you recall about that
11 meeting was said by either you or her?
12     **A.** The only thing I can remember about that
13 meeting was we did have it in the deputy chief's
14 office. I can remember her sitting to my right, as
15 Mr. O'Donnell is, the deputy chief sat in front of
16 me. And really the only thing I remember
17 specifically out of that meeting was the deputy
18 chief, as the meeting concluded, saying you will get
19 whatever is owed to you, or something to that effect.
20 Or if the City owes you something, we'll make sure
21 that you get it. That was -- basically he was
22 telling her that we're going to get everything taken
23 care of.
24     **Q.** Did she think she had been underpaid?
25     **A.** I don't know exactly what she thought.

Page 10

1     **Q.** Prior to this, had anybody else complained
2 about not making overtime?
3     **A.** To me?
4     **Q.** To you.
5     **A.** No.
6     **Q.** Were you aware of anyone complaining to
7 anybody else?
8     **A.** No, sir.
9     **Q.** What, if anything, did you do regarding
10 this issue that she, that Ms. Baker brought up at
11 this meeting after that meeting?
12     **A.** I didn't do anything. I've already taken
13 it to my next level of chain of command so I'm
14 basically out of it.
15     **Q.** And that would be Deputy Chief Gilbert?
16     **A.** Yes.
17     **Q.** You never had any conversation or anything
18 else about that after that?
19     **A.** With who?
20     **Q.** With anyone.
21     **A.** Not that I recall.
22     **Q.** Were you interviewed by the labor board
23 when they came down to interview people?
24     **A.** Unfortunately, no, I was not.
25     **Q.** Why do you say unfortunately?

Page 11

1     **A.** I would hope that we would have been paid
2 back more money than what we actually got.
3     **Q.** Did you get money too?
4     **A.** I did. Oh, yes. I wish we could have went
5 more to the left than we did by about 15 or 18
6 more years.
7     **Q.** There you go. Have you ever put pressure
8 on law enforcement officers to write more tickets?
9     **A.** No.
10     **Q.** Let me show you an e-mail from you sent to
11 various people. Can you read the first two
12 sentences? First of all, do you recognize this
13 e-mail?
14         MR. O'DONNELL: Exhibit 8, right?
15         **MR. WOODRUFF:** I thought I said
16 Exhibit 8. Didn't I?
17         **MR. O'DONNELL:** No.
18         **MR. WOODRUFF:** If not, Exhibit 8.
19     **A.** Yeah, I remember. I think I remember
20 something like this. I just used this also, a list
21 from 2014.
22     **Q.** (Mr. Woodruff) Right. And the first
23 sentence says, for the month of November 2014, it was
24 the worst month of the year as far as production
25 goes. I have officer with zero tickets and the most

Page 12

1 being 28. I have some of you with one, three and
2 five tickets for an entire month.
3     **A.** Uh-huh (Indicating yes).
4     **Q.** So you had a problem if they didn't write
5 enough tickets that month?
6     **A.** Total production. You have to look at
7 everything that the guys do. That's everything.
8 Tickets, could be warnings, could be the hard
9 tickets. And then I mentioned the word production,
10 and production meaning things that -- all the things
11 we do. Our reports, our alarm calls, wrecks, all
12 them things like that.
13     **Q.** The tickets is where the money is brought
14 into the police department, right, or brought into
15 the city?
16     **A.** I don't have anything that -- I don't know.
17     **Q.** Are you aware of what percentage of their
18 budget is taken care of by tickets?
19     **A.** None. I mean I have no idea whatsoever.
20     **Q.** Has anybody above you ever told you we need
21 to write more tickets?
22     **A.** No.
23     **Q.** Have you ever heard the term two tickets a
24 day keeps the major away?
25     **A.** I have heard that.

**Deposition of Tim Bell, taken November 13, 2018**

4

---

Page 13

1    **Q.** Who did you hear that from?
2    **A.** I can't recall specifically what it was. I
3    don't know. That was when I was a rookie. That was
4    20 years ago.
5    **Q.** Okay. Let me show you Exhibit Number 9.
6    This purports to be another e-mail from you.
7    **A.** Yeah. I know all about this one.
8    **Q.** Okay. And this was the e-mail concerning
9    James Andrews?
10   **A.** Uh-huh (Indicating yes).
11   **Q.** And Marty Mask asking about him getting, I
12   guess, PO3 or some -- moved up as far as rank-wise?
13   **A.** Advancement, yes.
14   **Q.** And you said, I agree he's a good officer.
15   However, hard to go fight for him when he works
16   fourteen days this month and turns in seven tickets.
17   **A.** Yes.
18   **Q.** You didn't use the term statistics there,
19   you said turns in seven tickets.
20   **A.** Right. Which could be either warnings or
21   hard tickets. We have also basically a citation that
22   you write rather than arresting somebody. I forget
23   off the top of my head what it's called. But that
24   was basically, that was what he did for that month.
25   And when I have one officer that's working really

---

Page 14

1    hard and out basically fighting crime and doing what
2    he's supposed to do the 12 hours that he's working,
3    it's hard for me to push a guy that's doing half the
4    work that another guy is doing, and work meaning COP
5    events, neighborhood association meetings, alarms
6    calls, et cetera, et cetera. There's a whole big
7    long list that we look at.
8    **Q.** Has any of the officers under you ever
9    complained that they felt like they were being
10   pressured to write tickets?
11   **A.** No.
12   **Q.** You never had any discussion with James
13   Hood about that? Did he ever complain about the
14   pressure of writing more tickets?
15   **A.** If he did I do not recall it.
16   **Q.** Fair enough. Let me show you -- and you
17   can take whatever time you need to review this
18   document, Captain Bell. This is a Citizen Action
19   Request that I believe went in to you. First of all,
20   let me just ask you. Is that your initials on the
21   bottom?
22   **A.** It looks like it.
23   **Q.** Looks like TDB?
24   **A.** Uh-huh (Indicating yes).
25   **Q.** Take whatever time you need to review the

---

Page 15

1    document and I'll have a few questions for you, sir.
2    **MR. O'DONNELL:** And, Ron, that's
3    Exhibit 11.
4    **MR. WOODRUFF:** I'm sorry. I'm off my
5    game today.
6    **A.** Yeah, I took this one.
7    **Q.** (Mr. Woodruff) Okay.
8    **A.** Yeah, I remember it.
9    **Q.** What do you recall about that?
10   **A.** Just what it says. It was a taxicab
11   driver, they came in on February 27th, they came in
12   to complain on Baker, basically that she was stopping
13   them for pulling out of a private parking lot not
14   using a turn signal, if I remember right. She did
15   write a ticket to him for the improper turn. And
16   then if I look on Page 2, I think I received it and I
17   turned it up to Major Clayton.
18   **Q.** And as far as that, you said a taxi driver.
19   Isn't it true the taxicab owner came in and
20   complained about his driver being given a ticket?
21   **A.** That may have been what happened. And, of
22   course, if it's like a second party, I can't take a
23   complaint from him because he wasn't the one that was
24   actually involved.
25   **Q.** Well, I mean, it says here, I'm the

---

Page 16

1    co-owner of Yellow Cab and I have some concerns about
2    a stop that was made on one of my drivers that is an
3    illegal stop. My driver was also cited.
4    **A.** I did take his statement. That's what that
5    is right there. Now, I don't remember. I think I
6    turned it over to IA, but my hands were washed of it
7    then anyway.
8    **Q.** I didn't see any statement -- I don't
9    recall seeing a statement from Johnny Slaughter. Did
10   you take a statement from Johnny Slaughter, the
11   taxicab driver?
12   **A.** I don't remember if I did or didn't.
13   **Q.** Fair enough. Do you have to -- do you --
14   is it illegal for you not to use your turn signal
15   when you turn from a motel onto a street?
16   **A.** Could you repeat the question?
17   **MR. O'DONNELL:** Object to form.
18   **Q.** (Mr. Woodruff) Is it illegal to turn -- to
19   enter from a hotel parking lot onto a street without
20   using your turn signal?
21   **MR. O'DONNELL:** I'm not sure he
22   understands. You're stating it in a negative way, I
23   think. What Ron is asking --
24   **MR. WOODRUFF:** Well, the ticket is
25   negative.

---

**Deposition of Tim Bell, taken November 13, 2018**

5

---

Page 17

1      **MR. O'DONNELL:** So the question is, is
2 it a violation of Mississippi law not to use the turn
3 signal when exiting a private parking area?
4      **MR. WOODRUFF:** I think that's what
5 illegal means.
6      **A.** My understanding of using a turn signal
7 when you come out of a private parking lot, you don't
8 have to use your turn signal coming from a private
9 parking lot onto a city street -- onto a public
10 street.
11      **Q.** (Mr. Woodruff) But you didn't know that at
12 the time the issue came up with this complaint
13 though, did you?
14      **A.** Did I?
15      **Q.** Yes.
16      **A.** Yeah, I knew that.
17      **Q.** Well, why did you go to -- there's -- in
18 Jerry Davis' report it talks about you going down to
19 the municipal court --
20      **A.** Uh-huh (Indicating yes).
21      **Q.** Let me see if I can find it. All right.
22 In Exhibit Number 14, Bates Stamp JLB-205, it says
23 Officer Baker used a nonexistent charge to justify a
24 traffic stop in three identified incidents on private
25 property. Patrol Captain Bell contacted Tupelo

---

Page 18

1 Municipal Court and the Mississippi Highway Patrol
2 both verified this was not an offense. So if you
3 knew that it wasn't an offense, why did you contact
4 the Tupelo Municipal Court?
5      **A.** I remember doing both of those. One, I was
6 wanting to verify that what I knew was correct and,
7 two, also that the law had not changed that I was
8 unaware of. Because there are updates that happen to
9 laws. So I'm just verifying my work before I send
10 anything up. I mean, I'm human. I make mistakes
11 too. But that's why I wanted to double check and
12 make sure that what I knew was correct and nothing
13 had changed.
14      **Q.** So your testimony here is that you knew
15 prior to these incidents with Ms. Baker that that
16 was -- you could not write a ticket for someone
17 leaving private property without using their turn
18 signal?
19      **A.** As far as I knew, yes.
20      **Q.** Because I deposed two officers this morning
21 who said that you can write a ticket for people
22 leaving private property onto a street without using
23 a signal, including James Hood and Jason Whitenton, I
24 believe.
25      **A.** Yes. They are both former officers who no

---

Page 19

1 longer work with the police department.
2      **Q.** Was this a relatively new statute?
3      **A.** I've always known it. That might be one of
4 the reasons why they no longer work here too.
5      **Q.** You think that's why they were terminated?
6      **A.** I don't know. I think James retired and I
7 don't know about Whit.
8      **Q.** Well, you were involved with Whit as far as
9 his termination, weren't you?
10      **A.** His termination?
11      **Q.** His forced resignation. I'm sorry.
12      **A.** I was.
13      **Q.** And had to do with -- you know, I've read
14 he made a derogatory comment about you and some other
15 people and sent an e-mail previously that was
16 people -- that somebody considered racist. Were you
17 involved --
18      **A.** I don't have anything to do with any of
19 that.
20      **Q.** You weren't involved in the investigation
21 or anything?
22      **A.** No. The only thing that -- yeah, I wasn't
23 involved with that.
24      **Q.** Have you ever read this statute, Exhibit
25 Number 12?

---

Page 20

1      **A.** Yes. I think Jim Waide, your associate,
2 showed it to me in something else that we were being
3 deposed on.
4      **Q.** Jim Waide? I've heard that name.
5      **A.** Yes.
6      **Q.** You know, I've read it many, many times. I
7 don't say that -- I can't see that it says it specifically
8 says you don't have to write -- use a turn signal
9 from the hotel parking lot onto a street, but is that
10 the way you read that?
11      **A.** I don't see where it says it does or does
12 not.
13      **Q.** Got you. Had you ever read this Exhibit
14 Number 14, the investigative report of Jerry Davis?
15      **A.** Is that on Jerry Davis or what is that
16 concerning?
17      **Q.** The Jerry Davis investigative report of
18 Jennifer Baker that preceded her termination.
19      **A.** On internal affairs, no. I've never seen
20 it.
21      **Q.** You've never read it?
22      **A.** Unh-unh (Indicating no). We don't -- I
23 don't have that privilege to see any of that stuff
24 once it goes to that. Once they draw a number, it
25 belongs to them and we don't ever see it.

---

**Deposition of Tim Bell, taken November 13, 2018**

Page 21

1     **Q.** Are you aware that you're identified in
2  this document as the complainant?
3     **A.** No. I have no idea.
4     **Q.** Would you agree where it talks about
5  investigative report, he says immediate supervisor is
6  Lieutenant Mansell, chief complainant, City of
7  Tupelo, Captain Tim Bell. Do you know why you're
8  listed as a complainant?
9     **A.** I have no idea.
10     **Q.** It says here, and I'm just kind of reading
11  through this. Since you've never seen it, I'm not
12  going to have you read it. I'll just read what it
13  says. Bell had heard that Baker had stated that she
14  was going to start writing tickets to older white
15  people in an effort to generate complaints. Where
16  did you hear that from?
17     **A.** I want to say from Jay Marshall.
18     **Q.** When did you hear that from him?
19     **A.** I don't remember. It was -- I have no
20  idea. I don't remember the date or if it was around
21  this time frame or before or after.
22     **Q.** It says here, and then it says Bell decided
23  to review other in-car video of vehicle stops
24  involving Baker. During the review he identified
25  five vehicle stops that were made by Baker that were

Page 22

1  questionable. So you went back and looked at the
2  video; is that correct?
3     **A.** When the initial complaint came in is when
4  I began trying to find that particular stop. And
5  when I was looking for that particular stop, I saw
6  these other things that were being done.
7     **Q.** All right. And when you say the initial
8  complaint, we're referring to 11, the complaint from
9  Eddie Richey concerning Johnny Slaughter?
10     **A.** The taxicab. Yeah, I believe that was it.
11     **Q.** And it looks like that complaint was on
12  March 1st, 2017. Does that sound right?
13     **A.** If that's what's on the document.
14     **Q.** It looks likes March 1st here. You say,
15  see video dated 2-27. Is this your handwriting here
16  on the second page?
17     **A.** Yes.
18     **Q.** So what does it mean, see video dated 2-27?
19  Was that when the stop was?
20     **A.** I guess so. That should be. I probably
21  attached -- I probably didn't attach anything to it.
22  You can go and reference the actual date and time.
23     **Q.** Got you.
24     **A.** Once you identify what you're looking for.
25     **Q.** So you went and actually looked at the

Page 23

1  video, correct?
2     **A.** Uh-huh (Indicating yes).
3     **Q.** And what other video did you look at at the
4  time that you went back and looked at this stop,
5  2-27?
6     **A.** I was looking at all the videos trying to
7  figure out which one, the one I was trying to find
8  basically. And identified several videos where I
9  thought that misconduct was being done.
10     **Q.** Was this on -- were you looking at videos
11  just from 2-27 or for other dates?
12     **A.** I don't remember.
13     **Q.** So you don't recall how much -- I mean, it
14  looks like you're the initial person that went back
15  and looked at the videos; is that correct?
16     **A.** Yeah. Because it starts with me.
17     **Q.** And I'm trying to understand how far -- how
18  many hours of videos did you look at?
19     **A.** It wouldn't have been hours. I think
20  probably when I first started seeing some of the
21  violations that I was seeing, that I quickly
22  identified several and then stopped and gave it --
23  sent it to my major.
24     **Q.** It says here that on 3-1-17, I took a
25  statement -- I guess this is Jerry Baker -- from

Page 24

1  Officer Jay Marshall concerning discussion he and
2  Baker had on 2-2-17. Do you know why Jay Marshall is
3  writing a statement a month after this event had
4  allegedly initially happened?
5     **A.** I do not.
6     **Q.** All right. It says you -- did you identify
7  certain videos for Jerry Davis to look at that you
8  thought that there were questionable things that Ms.
9  Baker had done?
10     **A.** I identified several videos that Baker was
11  doing that I considered crimes that I gave to Major
12  Clayton, who was my next chain of command.
13     **Q.** When you say crimes, what do you mean?
14  What crime?
15     **A.** Stopping people for fabricated reasons.
16     **Q.** Okay. It says --
17     MR. O'DONNELL: Go ahead.
18     **MR. WOODRUFF:** Are you done?
19     **MR. O'DONNELL:** When you get a
20  breaking point, I want to make sure that's not Jerry
21  Davis out there.
22     **MR. WOODRUFF:** Do you want to take a
23  break? Yeah, let's take a quick break.
24     (Recess)
25     **Q.** (Mr. Woodruff) And I guess I'm not doing a

**Deposition of Tim Bell, taken November 13, 2018**

7

Page 25

1    good job of asking.  It says Video 1 occurred on
2    2-2-17.  And then there's the March 3, '17, video.
3    Or let's see, Video 2 occurred on 2-27-17.  Video 3
4    occurred on 3-22-17.  Video 4, 2-27-17.  Five,
5    2-7-17.  So it looks like of these videos, I'm
6    looking at February 2, February 27th and February
7    22nd is the video.  Did you look at all the
8    video, the entire shift for those dates?
9        A.  I specifically looked at her videos because
10   I had already seen basically crimes being committed.
11   So I was trying to see how much or how specific or
12   how detailed or how serious any other crimes that
13   were committed by Baker were on video.
14       Q.  Okay.  And I'm not -- I guess I'm not doing
15   a good job.  I'm trying to understand how much video
16   did you look at?
17       A.  It depends on the officer.  I don't
18   remember.  If you have an officer that works, gets
19   out there and works a complete 12-hour shift, he's
20   liable to have, you know, four hours or five hours of
21   video for that one day.  If you have an officer
22   that's really not doing much or they're slow that day
23   or they don't feel good, whatever, it may only be a
24   three-minute video.  So one day I could look at in
25   three minutes or it would take me five hours to look

Page 26

1    at one day.  It depends on how much work that officer
2    does or what's the officer's call volume.
3        Q.  And so do you recall how long -- how
4    much -- and those three days, did you look at their
5    entire call volume those days?
6        A.  I don't remember.  It didn't take me long
7    to identify the crimes that were being committed and
8    to push it off of my desk to Major Clayton.  I do
9    remember that.
10       Q.  Did you ever talk to anybody in the FBI or
11   anyone else concerning allegations of crimes
12   committed by Ms. Baker?
13       A.  I did not.  I know the FBI was contacted.
14       Q.  But you weren't -- were you involved in
15   those conversations?
16       A.  No.
17       Q.  Have you ever thought you had probable
18   cause for a stop and after -- later you looked at the
19   video and saw that your eyes had deceived you?
20       A.  No.
21       Q.  So any time you -- what you see on the
22   video is always exactly what you witness when you
23   thought you had probable cause for a stop?
24       A.  From my videos.
25       Q.  Yes.

Page 27

1        A.  That I'm sitting behind the video camera or
2    I had the video camera on my chest, yes, that's
3    exactly what I'm seeing.
4        Q.  So you've never made a mistake as far as
5    probable cause?
6        A.  No, I can't say that.  But I can tell you
7    that if I'm sitting basically directly behind my
8    video camera that's looking at a crime or not a
9    crime, that's what my eye isn't altered.  The video
10   cameras from a store angle, from a different position
11   and all that, then yeah, they might see something
12   that I don't see.  But if I'm -- just say if I'm in
13   an in-car, let's just use Baker's stops, for example.
14       Q.  Right.
15       A.  She's sitting in a patrol car.  That camera
16   is basically at her rear view mirror.  It's seeing
17   exactly what she's seeing.
18       Q.  Right.
19       A.  There's absolutely no way whatsoever you
20   can make a mistake with that.  It's there.  It's
21   HDTV.  It's plain Jane.
22       Q.  So there's no way you can make a mistake
23   that you thought a person did or did not turn --
24       A.  There's no way that I could make a mistake
25   or anybody in their right mind could make a mistake

Page 28

1    with the violations that she was claiming that was
2    happening, of course, that were not happening.
3        Q.  One of them when a person pulled out in
4    front of another person; do you recall that video?
5        A.  I recall that's what she said happened, but
6    that's not what occurred on video.
7        Q.  Well, they did pull out in front of them?
8        A.  They did pull out, but not in the way that
9    she explained to them.
10       Q.  But they did pull out in their lane in
11   front of them?
12       A.  They did pull out into a lane of traffic.
13   That's correct.
14       Q.  In front of them?
15       A.  They were in front of them.
16       Q.  And the person at the McDonald's did stop
17   in the middle of the lane trying to get across the
18   lane.
19       A.  I don't remember specifically what -- I
20   remember there were some blinkers.  I know that was
21   probably one of the ones that I looked at that said
22   that Baker should be charged for what she did on that
23   stop, because it was very blatant that she lied to
24   that suspect, or that driver of the car.
25       Q.  I'm sorry to interrupt.  What are you

**Deposition of Tim Bell, taken November 13, 2018**

Page 29

1 claiming that you witnessed in these videos that was
2 illegal?
3     A. I haven't looked at those videos or any of
4 the documents since 2017. I don't recall
5 specifically. I do recall that the one at
6 McDonald's, I think that she said that he did not
7 use -- did not use a turn signal and that he cut
8 somebody off, when clearly you see the turn signal
9 on, and I want to say even something about his brake
10 lights too, that he had brake lights on as well.
11     Q. Why don't you go ahead and take whatever
12 time you need to review Exhibit 14, if you haven't
13 reviewed the videos for a while. And then I'm going
14 to ask you about what -- tell me specifically in
15 there, you made the allegation what she did, she did
16 something illegal. I want to know, based upon that,
17 what are you specifically claiming she did that was
18 illegal?
19     A. She violated people's right. She's
20 stopping people for no reason and falsifying charges
21 and issuing citations for it. All day long. She
22 should have been charge by the FBI.
23     Q. I want to know specifically.
24     A. Those videos, however -- whatever you
25 referenced, those four or five videos, all you got to

Page 30

1 do is hit play and you can clearly see what the
2 violations are.
3     Q. I think three of them were people pulling
4 out of hotels.
5     A. Let's go with one. Pick whichever one of
6 the other two you want to go with, and it's a
7 violation.
8     Q. I've got five. I've got three people
9 pulling in. One of them is where someone pulls out
10 in front of another person.
11     A. Yes.
12     Q. Where --
13     A. She claimed -- if I remember right, she
14 claimed that the car that was coming up behind had to
15 slam on their brakes and aggressively move to the
16 other lane to keep from colliding with them, which
17 was clearly not the case on the video at all.
18     Q. And so you're claiming that that was
19 illegal?
20     A. The stop was illegal.
21     Q. The stop was illegal.
22     A. Yes. In my opinion, yes, it's criminally
23 illegal. She should be charged by the FBI.
24     Q. And there's no way she just made a mistake
25 on that?

Page 31

1     A. There's absolutely no way she made a
2 mistake on that.
3     Q. And the other one -- other than the three
4 where they pulled out from a hotel and got a ticket
5 for not using a turn signal, the other one was the
6 McDonald's one.
7     A. I remember the McDonald's one.
8     Q. Where she thought that they didn't use
9 their turn signal, but you could see in the video
10 they did.
11     A. It was clearly on. And I want to say there
12 was something to do with the brake lights, like even
13 she mentioned the brake lights weren't working. I
14 can't remember. I want to say that's correct. But,
15 yes, that's another clear violation. There's no way
16 you can make a mistake doing that.
17     Q. There's no way you can miss at nighttime
18 whether a light is out?
19     A. If she was missing that, then she does not
20 need to be employed as a police officer. That's
21 correct.
22     Q. But she could have missed that?
23     A. I don't see how she could have. There's no
24 way.
25     Q. And during the stop at the McDonald's, she

Page 32

1 did tell the person that they're putting pressure on
2 her to write tickets; isn't that correct?
3     A. Yes, she did.
4     Q. Were you upset about that?
5     A. No.
6     Q. And that was on two -- it says right here
7 video on 2-27, 20:54, I guess that's almost 9 o'clock
8 on South Gloster, issued the driver a citation for no
9 seat belt and tells him Tupelo Police Department,
10 right now my supervisors are on me to write more
11 tickets and to document every one of my stops, so I
12 chose the cheapest one I could give you. Okay?
13 Baker then disengaged from the stop.
14     A. Uh-huh (Indicating yes).
15     Q. And you're aware of that, correct?
16     A. I'm aware she said that, yeah.
17     Q. Was that part of her official job duties to
18 tell people that the Tupelo Police Department were on
19 her to write more tickets?
20     A. Not that I'm aware of. The only reason why
21 I think that she pushed that out there was because of
22 what I know now, which was she was trying to generate
23 complaints from the public for citations.
24     Q. And that's just your speculation, right?
25     A. No. There's, I think, the conversation

**Deposition of Tim Bell, taken November 13, 2018**

---

Page 33

1   that Jay Marshall had with her, which is documented
2   also. There's also a videotape of her stopping an
3   elderly lady down on Spring Street that she kind of
4   gets on. I don't even remember if she wrote her a
5   ticket or not. But she can clearly be heard as she
6   gets back in the vehicle, there's my complaint.
7   Which just helps to justify what the conversation
8   between her and Marshall were, and what she was doing
9   on these stops was making up charges, making up stops
10  and trying to generate complaints from the public.
11      Q.   Did it disrupt the efficiency of the Tupelo
12  Police Department by her making the comment that
13  supervisors are on her to write more tickets?
14      A.   I don't know why she said that or what
15  effect it had on anything. As far as I know, it
16  didn't have an effect on anything.
17      Q.   And it's definitely not part of her
18  official job duties?
19      A.   If it's written somewhere, I've never seen
20  it.
21          MR. O'DONNELL: Object to the form.
22  It mischaracterizes prior testimony.
23      Q.   (Mr. Woodruff) One of the reasons why,
24  according to the documents, at least the EEOC charge,
25  position statement to the EEOC -- let me go ahead and

Page 34

1   read it. You may never have seen that.
2          All right. First, let me let you look at
3   Exhibit Number 10. Take whatever time you need to
4   see. And basically I just want to know if you've
5   ever seen this document before?
6      A.   What is it?
7      Q.   It's a position statement to the EEOC, when
8   someone files an EEOC charge.
9      A.   I understand what they are. But no, I've
10  never seen this one before.
11      Q.   You've never seen it?
12      A.   Unh-unh (Indicating no).
13      Q.   I just want to verify that first.
14      A.   I've never seen it. Do you want me to read
15  it?
16      Q.   No. It's not necessary. I just wanted to
17  verify whether you've seen it or not. All right.
18  And as far as the position statement, it says -- it
19  says, charging party, that's Ms. Baker, was
20  discharged as a consequence of the department's
21  Internal Affairs Division investigation of a number
22  of citizens' complaints which commenced in February
23  2017 -- we've seen the Internal Affairs, Jerry
24  Davis -- concerning traffic stops and issuing
25  citations by Officer Baker without probable cause.

Page 35

1   Further investigation reveals that Officer Baker
2   engaged in a pattern of issuing citations for alleged
3   illegal turns by vehicles exiting private parking
4   areas, which is not a legal traffic offense, and for
5   engaging in racial (African American) and other
6   profiling of motorists and stopping motorists who are
7   proceeding in a lawful fashion. And it also says, it
8   was also reported by certain citizens that Officer
9   Baker justified her traffic stops by stating she was
10  being pressured to issue more citations.
11          So according to the position statement, this is
12  the reasons why she was terminated. Now, we've
13  talked about the illegal turn, the pulling off of
14  private property.
15      A.   Yeah. I think if it was just that, I think
16  that was something we could have worked through and
17  got her some positive training, corrective training,
18  and that would have been it.
19      Q.   All right. And we've talked about that.
20  Is there anything else about that that you want to
21  add? I think we've pretty much covered it. The
22  second thing is engaging in racial profiling of
23  African American motorists. Did you ask Chamila
24  Brown to go back and look at her tickets to see if
25  there was a pattern of her pulling over either older

Page 36

1   or black people?
2      A.   I remember Chamila doing -- there were some
3   note cards or something that had tag numbers. That's
4   them right there.
5      Q.   Exhibit 15. And I don't think she -- if I
6   remember correctly, I don't think she remembers who
7   asked her. But somebody asked her to go through and
8   look at the tickets of Jennifer Baker and see whether
9   there was a pattern -- if you see in there she lists
10  the gender, race and birth date of these people that
11  she wrote -- or the tickets she wrote. And I guess
12  my first question is, did you ask her to do that?
13      A.   If I did, I do not remember.
14      Q.   Did you review this documentation after she
15  did it, after Chamila Brown did it?
16      A.   I remember seeing it, yes.
17      Q.   So you have seen this before?
18      A.   Yeah. Because I remember the notebook
19  pieces of paper.
20      Q.   And did you actually go through and see
21  that there's -- you know, and I counted them earlier.
22  There's approximately -- the race of the -- I believe
23  there's nine blacks, around nine blacks and there's
24  around thirty-three tickets. Nine -- thirty-three
25  tickets, three (sic) of them against blacks, would

**Deposition of Tim Bell, taken November 13, 2018**

Page 37

1  you consider that a profiling of black persons?
2      **A.**  I mean, I don't know what the nine stops
3  were.  I don't really have an opinion on it yes or
4  no.
5      **Q.**  Well, nine out of thirty-three is just --
6      **A.**  One, I don't know if this -- I wouldn't
7  know if this was verified work or if this was correct
8  tag numbers or whatever.  I didn't even pay attention
9  to it when I got it because I already knew what Baker
10  was doing on camera was enough that she didn't need
11  to work with us no more.  So I didn't care anything
12  about any of that.
13      **Q.**  And I only saw, I believe three of the
14  people who received tickets were born before 1970.
15      **A.**  Again, I wouldn't have any way to verify if
16  this -- that this stuff was correct or not.
17      **Q.**  Would you have any reason to believe that
18  is Chamila Brown falsified this documentation?
19      **A.**  I don't know if she did or did not.
20      **Q.**  Isn't it -- was the fact she was racial
21  profiling blacks one of the reasons she was
22  terminated?
23      **A.**  I can't answer that question.  The chief
24  can.  I would say the reason why she was terminated
25  was those traffic stops that she was doing, which

Page 38

1  were on African Americans.
2      **Q.**  And, of course, she accuses her specifically
3  in this position statement of racial profiling and
4  other profiling of motorists.  I'm sure that's older
5  people?
6      **A.**  I don't know who wrote that.
7      **Q.**  Well, wouldn't you agree there's, in the
8  documentation done by Chamila Brown, there's no
9  pattern of racial profiling or age profiling in this?
10      **A.**  Again, I wouldn't be able to verify that
11  work or know what the nine stops are or what those
12  stops were about.  I mean, I don't know.
13      **Q.**  She said she -- this is the documentation
14  from the tickets that were wrote.
15      **A.**  Okay.
16      **Q.**  So you said you just looked at it but you
17  really didn't pay any attention to it?
18      **A.**  No.
19      **Q.**  All right.  Let's talk about -- are you
20  aware of allegations that there has been racist
21  e-mails distributed among police officers with the
22  Tupelo Police Department?
23      **A.**  All right.  Repeat the question again.
24      **Q.**  Are you aware of allegations that there has
25  been racist e-mails or documents distributed among

Page 39

1  law enforcement officers with the Tupelo Police
2  Department?
3      **A.**  Yeah.  I'm familiar with a text message
4  concerning a guy we talked about earlier, Whit, Jason
5  Whitenton.
6      **Q.**  So you pronounce it Whittington(sic) too.
7      **A.**  It's Whitenton.
8      **Q.**  Is it?  Is that how you pronounce it?  I
9  thought you said it was -- I don't know.  Never mind.
10      MR. O'DONNELL:  Whit.
11      **THE WITNESS:**  That's it.
12      **MR. O'DONNELL:**  Let's all agree on
13  Whit, Ron.
14      **A.**  Call him Whit.  He'll be fine with that.
15      **Q.**  (Mr. Woodruff) I like it.  We'll call him
16  Whit, because We've been butchering his name.  All
17  right.  Let me show you -- I just deposed him a
18  little earlier today.
19      **A.**  Okay.
20      **Q.**  And it had to do with this.  The
21  allegation, I guess, from Officer Frison was he
22  received this e-mail and he thought it was racist
23  about Section 8 Barbie?
24      **A.**  I think it was a text message.
25      **Q.**  Or it might have been a text message.

Page 40

1  You're right.  It is a message.  But anyway, it's
2  Section 8 Barbie.  Did you see this?
3      **A.**  I have not.
4      **Q.**  And I guess --
5      **A.**  I heard about it when it happened and I
6  heard -- I remember something about Section 8 Barbie,
7  which I had no idea what that was.
8      **Q.**  I guess -- you can't really tell in this,
9  but I think he said down at the bottom, it's a white
10  Barbie with at least mixed race children down at the
11  bottom.
12      **A.**  Okay.
13      **Q.**  And the Section 8 I guess would be public
14  housing?
15      **A.**  That's what it normally is, public housing.
16  Yes.
17      **Q.**  And I guess Officer Frison was offended by
18  that.  Are you aware of that?
19      **A.**  Yeah.  I didn't have anything to do with
20  that.  But, yes, that's what I understood was that he
21  was offended by it.
22      **Q.**  Other than that, are you aware of any
23  allegation of any other racial documents that were
24  distributed among the police department?
25      **A.**  That's the only one I can think of off the

**Deposition of Tim Bell, taken November 13, 2018**

---

Page 41

1  top of my head.
2      Q.  Have you heard about what's called the "N"
3  word application?
4      A.  Am I aware of that?
5      Q.  Yes.
6      A.  No.
7      Q.  Had you ever seen it before?
8      A.  Unh-unh (Indicating no).
9      Q.  These three documents here --
10         MR. O'DONNELL:  That was a no?
11         THE WITNESS:  No.  Yes, sir.  I'm
12  sorry.
13      Q.  (Mr. Woodruff)  These three documents here
14  were part of the ethics report that was done a few
15  years ago into the racial allegations.  And let me
16  show you.  Have you ever reviewed that report?
17      A.  I have not.
18      Q.  All right.  Have you ever seen this first
19  document here on the first page?
20      A.  No.  But I can tell it's from an old
21  typewriter.  Because I've still got some accident
22  stuff that kind of has that same font to it.
23      Q.  Have you ever seen the second page of this
24  document?
25      A.  No.

Page 42

1      Q.  How about the third page?
2      A.  No.  I can hardly read it.  It's something
3  about a million bucks to get to Bolivia, to jet to
4  Bolivia.
5      Q.  You've never seen that document before?
6      A.  I have not.
7      Q.  Let me show you another thing that was
8  produced.  Have you ever seen this document
9  concerning Ray Nagin, used to be the Mayor of New
10  Orleans?  Have you ever seen this document before?
11         MR. O'DONNELL:  That's exhibit --
12         THE WITNESS:  Twenty-nine.
13         MR. WOODRUFF:  I'm sorry.
14  Twenty-nine.  Thank you.
15      A.  I have.  Matter of fact, I think that Jim
16  Waide showed me this some other previous deposition.
17  This was, if I remember right, it was -- had
18  something to do with the hurricane in 2005 between
19  the mayor and someone else down there.  It was widely
20  circulated.  It was not like it was -- I don't think
21  anybody around here wrote it.
22      Q.  (Mr. Woodruff)  And had you ever seen it
23  prior to Mr. Waide showing it to you at a deposition?
24      A.  I got asked about it years ago by Jackie
25  Clayton, Major Clayton.  It was alleged that I had

Page 43

1  sent this e-mail to some people.  I had not is what I
2  told him.
3      Q.  You denied it?
4      A.  I said I did not send that.  I really
5  didn't know anything about it until I started
6  researching it and then realize it was, whatever you
7  call it, huge e-mail chain, letter type deal.  It was
8  a conversation, like I said, between the mayor and
9  someone else.  Actually, I don't know if Waide is the
10  one that showed it to me or Carlos Moore.  It was one
11  of the two.
12      Q.  I was thinking when you said Waide a couple
13  of time, I was thinking you might be confusing him
14  with Carlos Moore.
15      A.  I said Waide twice, and one of them was a
16  while ago and then this one.  But I think maybe
17  Carlos may have introduced this one.
18      Q.  Do you know -- is Stacy Walker a friend of
19  yours?
20      A.  Yes.  I know Stacy.
21      Q.  Is his wife named Cheryl?
22      A.  I don't remember.  I haven't talked to
23  Stacy in six months or more, I don't think.  He
24  retired several years ago, so we don't see each other
25  much anymore.

Page 44

1      Q.  And Clay Haskel is an officer with the
2  Tupelo PD?
3      A.  We do have a Clay Haskel, yes.
4      Q.  But your e-mail address is not on here?
5      A.  No.
6      Q.  And I hate to ask you this, but you were a
7  -- you are still in the military?
8      A.  I'm retired.
9      Q.  You retired.  When did you retire?
10      A.  August 31st, 2016.
11      Q.  And how long had you been -- you were in
12  the Reserves or --
13      A.  National Guard.
14      Q.  National Guard.  How long had you been in
15  the National Guard?
16      A.  Twenty-four years.
17      Q.  And a particular branch?
18      A.  Army.
19      Q.  How many -- all 24 years?
20      A.  Yes.
21      Q.  What was your rank at the time you retired?
22      A.  First sergeant.
23      Q.  I'm sorry?
24      A.  First sergeant.
25      Q.  First sergeant.  And I believe you've done

**Deposition of Tim Bell, taken November 13, 2018**



### Page 45

1  at least one or more tours in the Middle East?
2      **A.**  I have.
3      **Q.**  How many tours have you done?
4      **A.**  Two.
5      **Q.**  Two.  Do you recall when the tours were?
6      **A.**  '04, '05 and '06.  I say that because I
7  went at the end of '04, all of '05, I came back in
8  '06.
9      **Q.**  That was the first tour?
10      **A.**  It was.  It was 19 months.  And then the
11  second tour was at '09 and '10 -- '08, '09 and '10,
12  somewhere along in there.  '09 and '10, I think.
13      **Q.**  How long was that tour?
14      **A.**  About 14 months.
15      **Q.**  And the first tour, where was that to?
16      **A.**  Iraq.
17      **Q.**  Iraq.  How about the second tour?
18      **A.**  Iraq.
19      **Q.**  Both were to Iraq?
20      **A.**  Yes.

### Page 48

9      **Q.**  Years ago I represented Sheila Shumpert in
10  a lawsuit.  And I don't believe I deposed you in that
11  case.  But there was an allegation about Larry Waites
12  being beaten up in the jail.  Were you accused of
13  that or were you accused of --
14      **A.**  I was accused of that, yes.  But the
15  videotape pretty much cleared all that up.
16      **Q.**  It cleared it all up?
17      **A.**  Uh-huh (Indicating yes).
18      **Q.**  Was there an accusation against you of
19  running over a person with handcuffs?
20      **A.**  No.
21      **Q.**  You never heard anything about that?
22      **A.**  No.
23      **Q.**  Was there an accusation about ever running
24  over somebody?
25      **A.**  Yes.  It wasn't an accusation.  I did run

**Deposition of Tim Bell, taken November 13, 2018**

---

Page 49

1  over somebody.
2      **Q.** Can you in a nutshell tell me what that
3  was?
4      **A.** The county, the sheriff's department, Lee
5  County Sheriff's Department was in a car chase.
6  Myself and other officers responded from downtown
7  Tupelo out east. They got to the, I believe they
8  call it the Corner Store up there at Eason and East
9  Main, right before you get out of town going to
10  Skyline. They had bailed out on foot. And we come
11  around the corner, we didn't know where they were at.
12  The suspects and one of the deputies popped out
13  between two cars. I went to go on my brakes, the
14  brakes didn't stop. And I hit the suspect and I hit
15  the deputy.
16      **Q.** But did you receive any disciplinary action
17  for that?
18      **A.** I did not. No. We went for a urinalysis
19  and MHP did their investigation and it was just an
20  unavoidable accident.
21      **Q.** Have you received any disciplinary actions
22  in the last 10 years?
23      **A.** No. I think I've had one and that was
24  probably in '98.
25      **Q.** And I believe in a deposition Mr. Waide

---

Page 51

1      (Deposition concluded at 12:29 p.m.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 50

1  took of you at one time, he asked you about having a
2  rebel flag on your truck; is that correct?
3      **A.** Yes.
4      **Q.** Do you still have that rebel flag on your
5  truck?
6      **A.** I do.
7      **Q.** Is it a flag or is it like a decal on your
8  windshield?
9      **A.** It's a license plate tag.
10      **Q.** Just a license plate tag. Okay. Just in
11  your front?
12      **A.** On the front. Yes, sir.
13      **Q.** Do you have any other Confederate flags at
14  your house?
15      **A.** No.
16      **Q.** And I believe -- and tell me again --
17      **A.** Well, no. That's a state flag. Yes.
18      **Q.** Just state flag?
19      **A.** Yes.
20      **Q.** But not just the confederate flag?
21      **A.** No, sir.
22      **MR. WOODRUFF:** That's all the
23  questions I've got. I tender the witness.
24      **MR. O'DONNELL:** I have no questions.
25      **MR. WOODRUFF:** Thank you.

---

Page 52

1          C E R T I F I C A T E
2  STATE OF MISSISSIPPI   )
3  COUNTY OF LEE          )
4  RE:  ORAL DEPOSITION OF TIM BELL
5      I, Regina D. Russell, RPR, CCR 1110, a Notary
6  Public within and for the aforesaid county and state,
7  duly commissioned and acting, hereby certify that the
8  foregoing proceedings were taken before me at the
9  time and place set forth above; that the statements
10  were written by me in machine shorthand; that the
11  statements were thereafter transcribed by me, or
12  under my direct supervision, by means of
13  computer-aided transcription, constituting a true and
14  correct transcription of the proceedings; and that
15  the witness was by me duly sworn to testify to the
16  truth and nothing but the truth in this cause.
17      I further certify that I am not a relative or
18  employee of any of the parties, or of counsel, nor am
19  I financially or otherwise interested in the outcome
20  of this action.
21      Witness my hand and seal on this 26th day of
22  November, 2018.
23
24      _____
25  My Commission Expires:  CCR 1110
    January 27, 2020        Notary Public